UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| GULF RESTORATION NETWORK, LITTLE TCHEFUNCTE RIVER ASSOCIATION, LOUISIANA ENVIRONMENTAL ACTION NETWORK, LOUISIANA AUDUBON COUNCIL, and SIERRA CLUB<br><br>   *Plaintiffs*,<br><br>     v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, SCOTT PRUITT (in his official capacity as Administrator of the United States Environmental Protection Agency), and ANNE IDSAL (in her official capacity as Regional Administrator of Region 6 of the U.S. Environmental Protection Agency),<br><br>   *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# COMPLAINT

Plaintiffs Gulf Restoration Network, Little Tchefuncte River Association, Louisiana Environmental Action Network, Louisiana Audubon Council, and Sierra Club make the following allegations against Defendants U.S. Environmental Protection Agency, Scott Pruitt (in his official capacity as Administrator of the United States Environmental Protection Agency), and Anne Idsal (in her official capacity as Regional Administrator of Region 6 of the United States Environmental Protection Agency) (collectively, "EPA").

## INTRODUCTION

1. This case is about the EPA's approval of drastically lowered levels of dissolved oxygen in thirty-one rivers, streams, creeks, bays, and bayous north and west of Lakes Pontchartrain and Maurepas and extending south and west to the Mississippi River ("affected waterbodies" or "affected waters"). To approve these nearly hypoxic standards, EPA disregarded Clean Water Act requirements that water quality criteria must protect the fish and wildlife which live in these waterbodies, relied on unsound science, and lacked a rational basis for the approval.

2. Among the affected waterbodies are portions of popular recreational waters like the Tchefuncte River, the Tickfaw River, the Amite River, the Tangipahoa River, Bayou Lacombe, Bayou Trepagnier, Cane Bayou, Bayou Labranche, Bayou Castine, Pontchatoula Creek, and Bayou Liberty.

3. The drastically lower dissolved oxygen criteria approved by EPA allows significant amounts of additional pollution – including treated sewage – to be discharged into these rivers, streams, creeks, bays, and bayous.

## JURISDICTION

4. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 (federal question jurisdiction). The case presents a federal question under the Clean Water Act § 303(c)(3), 33 U.S.C. § 1313(c)(3).

5. This Court may additionally grant relief under 28 U.S.C. § 2201 (Declaratory Judgment Act).

## VENUE

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiffs Gulf Restoration Network and the Little Tchefuncte River Association reside in the Eastern District and the action involves no real property.

7. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because "a substantial part of property that is the subject of the action is situated" in the Eastern District.

## PARTIES

*Plaintiffs*

8. Plaintiff Gulf Restoration Network is a network of environmental, social justice, and citizens' groups and individuals whose purpose is to restore the Gulf of Mexico to an ecologically and biologically sustainable condition and to protect and restore the resources of the Gulf Region for future generations. Gulf Restoration Network's members live in the five Gulf states of Louisiana, Texas, Mississippi, Alabama, and Florida, and nationwide. The lower dissolved oxygen criteria injures members by permitting deterioration of the water quality, ecosystem health, aesthetic value, and fish population of the thirty-one rivers and streams that they fish, hike, and recreate in. This lawsuit is germane to the Gulf Restoration Network's purpose.

9. Gulf Restoration Network is a "person" as defined by the Administrative Procedure Act (APA), 5 U.S.C. § 551(2).

10. Plaintiff Little Tchefuncte River Association is a not-for-profit association dedicated to the protection of the Tchefuncte River and its tributaries. The lower dissolved oxygen criteria injures members by permitting deterioration of the water quality, ecosystem health, aesthetic value, and fish population of the thirty-one waterbodies that they fish, hike, and recreate in. This lawsuit is germane to the Little Tchefuncte River Association's purpose.

11. Little Tchefuncte River Association is a "person" as defined by the APA.

12. Plaintiff Louisiana Environmental Action Network is a non-profit corporation which serves as an umbrella organization for environmental and citizen groups. LEAN's purpose includes preserving and protecting the state's land, air, water, and other natural resources, and protecting its members and other residents of the state from threats caused by pollution. The lower dissolved oxygen criteria injures members by permitting deterioration of the water quality, ecosystem health, aesthetic value, and fish population of the thirty-one rivers and streams that they fish, hike, and recreate in. This lawsuit is germane to LEAN's purpose.

13. Louisiana Environmental Action Network is a "person" as defined by the APA.

14. Louisiana Audubon Council is a non-profit corporation comprised of Audubon Chapters and National Audubon Society members. Louisiana Audubon Council is recognized as one of the leading environmental organizations in Louisiana and its purpose includes protecting and restoring habitats for birds and wildlife and furthering the conservation of land and water. The lower dissolved oxygen criteria injures members by permitting deterioration of the water quality, ecosystem health, aesthetic value, and fish population of the thirty-one rivers and streams that they fish, hike, and recreate in. This lawsuit is germane to the Louisiana Audubon Council's purpose.

15. The Louisiana Audubon Council is a "person" as defined by the APA.

16. The Sierra Club is a national nonprofit organization with 67 chapters and more than 828,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's

concerns encompass maintaining and enhancing water quality in the nation's rivers and streams and in protecting endangered and threatened species. The Club's particular interest in this case and the issues which the case concerns stem from the water quality degradation which the revised DO criteria will allow and the risk that the revised criteria pose to endangered and threatened species in the affected waterbodies. The Delta Chapter of the Sierra Club has approximately 3,300 members in the state of Louisiana. Delta Chapter members use the waters affected by the revised criteria and are injured by the effects of the revised criteria.

17. Sierra Club is a "person" as defined by the APA.

*Defendants*

18. Defendant Environmental Protection Agency is an agency as defined by the Administrative Procedure Act. 5 U.S.C. § 701(b)(1).

19. EPA is responsible for review and approval of state water quality standards, pursuant to 33 U.S.C. § 1313(c)(2)(a). EPA approved the water quality standards challenged in this case ("revised dissolved oxygen criteria," "revised criteria" or "revised DO criteria").

20. Defendant Scott Pruitt is EPA's Administrator and an officer as defined by 5 U.S.C. § 2104. He is sued in his official capacity.

21. Defendant Anne Idsal is EPA's Region 6 Regional Administrator and an officer as defined by 5 U.S.C. § 2104. She is responsible for review and approval of Louisiana water quality standards pursuant to 40 C.F.R. § 131.21, including the water quality standards at issue in this case. She is sued in her official capacity.

## **LEGAL BACKGROUND**

*Administrative Procedure Act*

22. The Administrative Procedure Act (APA) provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review." 5 U.S.C. § 704.

23. The APA authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), and (C-D).

*The Clean Water Act and Water Quality Standards*

24. The goal of the Clean Water Act (CWA or "the Act") is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

25. The Clean Water Act also creates a national goal of attaining "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water," often referred to as a goal of fishable and swimmable waters. Clean Water Act § 101(a)(2), 33 U.S.C. § 1251(a)(2).

26. To achieve this goal, the Clean Water Act directs states to set water quality standards that establish, and then protect, the quality of water necessary to achieve the goals of the Act. 33 U.S.C. § 1313(a).

27. The Clean Water Act directs EPA to review states' water quality standards to determine whether they comply with the requirements of the Clean Water Act. Clean Water Act § 303(c)(2)(A) and (c)(3), 33 U.S.C. § 1313(c)(2)(A) and (c)(3).

28. The purposes of water quality standards include "defin[ing] the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses." 40 C.F.R. § 130.2.

29. Whenever states adopt new water quality standards or revise existing water quality standards, the standards "shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of [the Clean Water Act]. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and [other purposes]." Clean Water Act § 303(c)(2)(A), 33 U.S.C. § 1313(c)(2)(A). This language includes an antidegradation policy, requiring that state standards be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation.

30. In addition to defining the water quality goals of a water body, water quality standards provide the regulatory basis for establishing water quality-based effluent limits for permits allowing pollutant discharges and also serve as a target for restoration procedures such as listings of impaired waters and setting of total maximum daily loads.

31. Water quality standards consist of 1) designated uses, 2) water quality criteria necessary to protect the designated use, and 3) antidegradation requirements.

32. Fish and Wildlife Propagation is one category of designated use. This category is defined in Louisiana as "the use of water for aquatic habitat, food, resting, reproduction, cover, and/or travel corridors for any indigenous wildlife and aquatic life species associated with the aquatic environment. This use also includes the maintenance of water quality at a level that prevents damage to indigenous wildlife and aquatic life species associated with the aquatic

environment and contamination of aquatic biota consumed by humans." La. Admin. Code tit. 33, pt IX, § 1111.

33. Outstanding Natural Resource Waters is another category of designated use adopted by Louisiana. This category is defined as including "waterbodies designated for preservation, protection, reclamation, or enhancement of wilderness, aesthetic qualities, and ecological regimes, such as those designated under the Louisiana Natural and Scenic Rivers System or those designated by the department as waters of ecological significance." La. Admin. Code tit. 33, pt IX, § 1111.

34. Water quality criteria are elements of state water quality standards, expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use. 40 C.F.R. § 131.3(b).

35. "States must adopt those water quality criteria that protect the designated use. Such criteria must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use." 40 C.F.R. § 131.11(a)(1).

36. The Clean Water Act allows states to revise water quality standards. 33 U.S.C. § 1313(c)(2)(a).

37. Where the water quality equals or exceeds the levels necessary to protect the designated use or otherwise required by applicable water quality standards, the water quality standard "may be revised only if such revision is subject to and consistent with the antidegradation policy established under this section." 33 U.S.C. § 1313(d)(4)(B).

38. States may establish water quality criteria based on site-specific conditions. 40 C.F.R. § 131.12(a)(2).

39. Both new and revised water quality standards must be established taking into consideration the use of the water for, among other things, propagation of fish and wildlife and recreational purposes.

40. Such new or revised water quality standards "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U.S.C. § 1313(c)(2)(A).

41. The antidegradation component of the Clean Water Act requires that state standards be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation.

42. EPA's antidegradation rules establish three levels of antidegradation protection: Tier 1, Tier 2, and Tier 3.

43. Tier 1 protection establishes the minimum water quality standard for all of a state's waters and requires that "[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." 40 C.F.R. § 131.12(a)(1).

44. Tier 2 protection applies when "the quality of the waters exceeds levels necessary to support the protection and propagation of fish, shellfish, and wildlife and recreation in and on the water." 40 C.F.R. § 131.12(a)(2). For such waters, EPA requires that their "quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located." *Id.* However, "[i]n allowing such

degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully." *Id.*

45. Tier 3 protection provides that "[w]here high quality waters constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance, that water quality shall be maintained and protected." 40 C.F.R. § 131.12(a)(3). Outstanding National resource waters are also known in Louisiana as Outstanding Natural Resource Waters (ONRWs).

46. EPA must review any revised water quality standard to determine that it meets the requirements of the Clean Water Act. 33 U.S.C. § 1313(c)(3); 40 C.F.R. §§ 131.5, 131.21(b).

47. If the standard is not consistent with the requirements of the Clean Water Act, EPA must disapprove the new or revised water quality standard. Clean Water Act § 303(c)(3), 33 U.S.C. § 1313(c)(3).

## **FACTS**

48. Before EPA's approval, the applicable dissolved oxygen water quality criteria for the affected waters was 5.0 mg/L of dissolved oxygen for freshwater rivers and streams and 4.0 mg/L of dissolved oxygen for estuarine rivers and streams.

49. Sufficient levels of dissolved oxygen in waterbodies like rivers, streams, creeks, bays, and bayous are essential for the survival and propagation of fish and other aquatic life like zooplankton and for the wildlife which rely on them.

50. On June 20, 2015, the Louisiana Department of Environmental Quality (LDEQ) published a proposed rule ("proposal") – designated WQ091 – to lower the dissolved oxygen criteria from 5.0 mg/L (or 4.0 mg/L for estuarine waters) to 2.3 mg/L for the months of March through November for thirty-one inland streams north and west of Lakes Pontchartrain and

Maurepas extending south and west to the Mississippi River ("revised dissolved oxygen criteria," "revised DO criteria," or "revised criteria").

51. LDEQ's proposal applied the revised criteria to the following waterbody subsegments: 040201, 040303, 040305, 040306, 040401, 040402, 040403, 040404, 040503, 040506, 040508, 040601, 040604, 040605, 040606, 040702, 040705, 040809, 040907, 040915, 040916, 040917, 041101, 041201, 041202, 040807, 040808, 040903, 040912, 040913, and 040914.

52. In WQ091, LDEQ also proposed to revise the boundaries for 42 waterbody subsegments, resulting in the delineation of 21 new subsegments ("boundary revisions").

53. The rivers, streams, creeks, bays, and bayous affected by the revised dissolved oxygen criteria are navigable waters.

54. The rivers, streams, creeks, bays and bayous to which LDEQ proposed to apply the revised water quality criteria include Outstanding Natural Resource Waters like portions of the Tchefuncte River, the Blind River, and Bayou LaCombe.

55. The revised dissolved oxygen criteria apply to at least thirty-one rivers, streams, creeks, bays and bayous across a 9-parish area: St. Tammany Parish, Tangipahoa Parish, St. John the Baptist Parish, St. Charles Parish, St. James Parish, Ascension Parish, Livingston Parish, Iberville Parish, and East Baton Rouge Parish.

56. The thirty-one affected streams all belong to an area designated by LDEQ as the eastern Lower Mississippi River Alluvial Plains Ecoregion ("the Ecoregion").

57. On July 21, 2015, LDEQ extended the comment period on its proposed rule from August 5, 2015, to September 4, 2015.

58. On September 4, 2015, Plaintiffs timely submitted comments to LDEQ opposing the revised dissolved oxygen criteria and boundary revisions. The comments included a 12-page affidavit from water quality expert, Dr. JoAnn Burkholder, detailing the many ways in which LDEQ's proposal was not supported by sound scientific rationale.

59. On September 11, 2015, Plaintiffs sent these comments to EPA via email, including Dr. Burkholder's affidavit.

60. On November 3, 2015, LDEQ issued a Comment Summary Response. LDEQ responded to some of Plaintiffs' comments, but LDEQ did not respond to anything in Dr. Burkholder's affidavit. Indeed, LDEQ did not even acknowledge the affidavit.

61. LDEQ made no changes to its proposed rule in response to public comment.

62. On January 6, 2016, LDEQ submitted the revised dissolved oxygen criteria and boundary revisions to EPA for approval.

63. On March 8, 2016, Plaintiffs sent comments to EPA requesting disapproval of the revised dissolved oxygen criteria and the redrawn subsegments. The letter included a supplemental expert affidavit from Dr. JoAnn Burkholder.

64. On June 3, 2016, EPA approved Louisiana's revised dissolved oxygen criteria for all proposed subsegments and approved the boundary revisions. This approval is final agency action.

65. EPA also approved revised boundaries for 42 subsegments within the Ecoregion, the Southern Plains Terrace and Flatwoods Ecoregion, the Terrace Uplands Ecoregion, and the Coastal Deltaic Marshes Ecoregion.

66. These boundary revisions resulted in the delineation of 21 new subsegments and in revisions to descriptions of additional subsegments.

67. Some of the 21 new subsegments created in the boundary revisions are subject to the revised criteria.

68. Neither EPA nor LDEQ determined whether any of the streams to which the revised dissolved oxygen criteria apply have dissolved oxygen water quality equaling or exceeding the level necessary to protect the designated use or otherwise required by applicable water quality standards.

69. Many of the streams to which the revised criteria apply have dissolved oxygen levels which equal or exceed the level necessary to protect the designated use.

70. EPA was aware that many of the streams to which the revised criteria apply have dissolved oxygen levels which equal or exceed the level necessary to protect the designated use.

71. EPA performed no antidegradation analysis before approving the revised criteria.

72. Neither EPA nor LDEQ determined whether the revised criteria complied with antidegradation policy.

73. The revised criteria applicable to many of the affected rivers and streams – including the Tchefuncte River – do not comply with antidegradation policy.

74. Ambient monitoring data collected by LDEQ (station 116) over the past several decades indicate that the portion of the Tchefuncte River represented by subsegment 040506 met the 5.0 mg/l dissolved oxygen criterion in 238 of 242 measurements, that is, 98.4% of the time. Plaintiffs sent this water quality data to EPA during its review of the revised dissolved oxygen criteria.

75. Ambient monitoring data collected by LDEQ over the past several decades indicate that the water quality of the Amite River, Tchefuncte River, Tickfaw River, Bayou Trepagnier, Colyell Bay, Gray's Creek, Natalbany River, Bayou Lacombe, Bayou Bonfouca,

Cane Bayou, Bayou Chinchubas, Bayou La Branche, Bayou Castine, Bayou Liberty, Tangipahoa River, Ponchatoula Creek all regularly exceed 5.0 mg/L dissolved oxygen.

76. EPA and LDEQ regularly rely on ambient water quality monitoring data when performing their Clean Water Act duties.

77. EPA has access to Louisiana's ambient water quality monitoring data on the affected waterbodies.

78. In its approval, EPA discounted the ambient water quality monitoring data from the Tchefuncte River and instead relied on continuous monitoring data from different waterbodies.

79. EPA relied on what it refers to as an "ecoregion" or "reference water body" approach in approving the sweeping application of site-specific criteria to thirty-one rivers, streams, creeks, bays and bayous in an entire region of the state (the Ecoregion).

80. EPA never engaged in rulemaking procedures to promulgate its ecoregion approach.

81. The premise of the EPA's ecoregion approach and methodology for approving the revised dissolved oxygen site-specific criteria, as it relates to water quality and aquatic life, is that in the absence of human influences the water quality and aquatic life are more likely to be similar within an ecoregion than without, and that conditions in "reference water bodies" in the Ecoregion represent the best attainable or least impacted conditions of most water bodies within the Ecoregion. Therefore, the fish and wildlife propagation use and corresponding ecological conditions in "least impacted reference waters" in the Ecoregion are the basis for defining the DO criteria in the Ecoregion.

82. In its approval, EPA relied on monitoring data from 13 reference sites, seven of which were outside of the Ecoregion and six of which were within the Ecoregion, to determine the appropriate dissolved oxygen criteria for all rivers, streams, creeks, bays and bayous within the Ecoregion.

83. Several of the reference sites upon which EPA relied were subjected to man-made influences and had significant point and nonpoint source discharges impacting them.

84. Information regarding the point and nonpoint source discharges affecting the reference sites was presented to EPA.

85. EPA did not respond to the information regarding the flaws in the reference site selection.

86. EPA's methodology to determine the appropriate revised dissolved oxygen criteria for all inland streams in the Ecoregion was based on water quality monitoring data from these reference waterbodies.

87. EPA considered the water quality conditions in the inland rivers, streams, creeks, bays and bayous of the Ecoregion to be irrelevant, aside from the condition of the six reference waterbodies in the Ecoregion. Therefore, EPA ignored the water quality conditions in the inland rivers, streams, and bayous of the Ecoregion, other than the six reference waterbodies in the Ecoregion.

88. EPA approved the revised criteria without any study of the impact the revised criteria would have on the fish and other aquatic life in the inland rivers, streams, creeks, bays and bayous of the Ecoregion.

89. Based on its methodology, EPA disregarded ambient monitoring data from the affected waterbodies and relied instead on monitoring data from the 13 reference waterbodies.

90. In approving the DO criteria, EPA disregarded 90% of the monitoring data collected from the reference streams. Instead, it relied exclusively on the worst 10% (lowest DO readings) of the monitoring data.

91. Estuarine waters are waters where freshwater systems and saltwater systems interact.

92. None of the reference waterbodies which formed the basis of the revised criteria are classified as estuarine.

93. At least six of the thirty-one waterbodies included in EPA's approval are classified as estuarine: 1) portions of Bayou Lacombe, 2) portions of Bayou Cane, 3) Bayou Paquet, 4) portions of Bayou Bonfouca, 5) Bayou Labranche, and 6) Bayou Trepagnier.

94. During a 2013 review of LDEQ's proposal, EPA commented to LDEQ that application of its proposed revised dissolved oxygen criteria to estuarine subsegments would be inappropriate, as no estuarine waters served as reference waterbodies.

95. On November 7, 2013, LDEQ responded to EPA's concern by clarifying that its proposed revision would only apply to freshwater inland streams and would not apply to estuarine or tidally influenced waters.

96. The revised dissolved oxygen criteria which LDEQ promulgated and EPA approved apply to estuarine and tidally influenced waters within the Ecoregion.

97. The revised dissolved oxygen criteria applies to at least ten waterbody subsegments which are designated Outstanding Natural Resource Waters ("outstanding National resource waters" or "Scenic Streams."). These include the Blind River (subsegments 040401 and 040403), portions of the Tchefuncte River (subsegments 040807 and 040808), portions of Bayou

Cane (subsegments 040903 and 040914), portions of Bayou Lacombe (subsegments 040912 and 040913), Bayou Labranche (subsegment 040201) and Bayou Trepagnier (subsegment 040202).

98. Neither EPA nor LDEQ performed any study or analysis of whether the revised dissolved oxygen criteria would be protective of the Outstanding Natural Resource Waters use.

99. All of the affected waterbody subsegments covered by the revised dissolved oxygen criteria are designated Fish and Wildlife Propagation.

100. Neither EPA nor LDEQ performed any study or analysis of the impact of the revised dissolved oxygen criteria on fish and other aquatic life in the affected rivers and streams.

101. Neither EPA nor LDEQ examined the effect of the revised dissolved oxygen criterion on fish that live or reproduce in the waters of the Ecoregion, including sensitive stages like larval and juvenile.

102. EPA's basis for approving the sweeping application of site-specific criteria to thirty-one streams in an entire region of the state (the Ecoregion) is that the waterbodies in the Ecoregion are alike in significant ways.

103. EPA's methodology for revising the dissolved oxygen criteria for the Ecoregion relied on a determination that the waterbodies in the Ecoregion were like the waterbodies in the adjoining western Lower Mississippi River Alluvial Plains Ecoregion (western LMRAP).

104. Once EPA concluded that the waterbodies in the Ecoregion were like the waterbodies in the western LMRAP Ecoregion, it automatically applied the criteria it had approved for the western Ecoregion to the Ecoregion.

105. EPA did not use the ecological conditions in the least impacted reference waters in the Ecoregion as the basis for approving the DO criteria in the Ecoregion. Instead, EPA used

the ecological conditions in the least impacted reference waters in the adjoining Ecoregion – the western LMRAP – as the basis for defining the DO criteria in the Ecoregion.

106. In approving the revised criteria, EPA did not consider whether the revised criteria would provide for the attainment and maintenance of the water quality standards of waters downstreams from the affected waterbodies.

107. Evidence before EPA demonstrated that portions of the Tchefuncte River included in the criteria change are not like other waterbodies in the Ecoregion in significant ways.

108. EPA disregarded the evidence that portions of the Tchefuncte River are unlike the described characteristics of waterbodies in the Ecoregion.

109. None of the thirteen reference streams are located on the northshore of Lake Pontchartrain from the Tangipahoa River east to the Pearl River.

110. EPA approved application of the revised dissolved oxygen criteria to stream segments outside of the Ecoregion.

## FIRST CAUSE OF ACTION

111. EPA's approval of the revised dissolved oxygen criteria was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, and not in accordance with the law.

## SECOND CAUSE OF ACTION

112. EPA's approval of the Ecoregion boundary revisions was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.    An order declaring that EPA's approval of the revised dissolved oxygen criteria violates the Clean Water Act and is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and not in accordance with the law;

B.    An order declaring that EPA's approval of the revised boundaries of the Ecoregion and subecoregions violates the Clean Water Act and was arbitrary, capricious, an abuse of discretion, and not in accordance with the law;

C.    An order vacating EPA's approval of the revised dissolved oxygen criteria;

D.    An order vacating EPA's approval of the revised boundaries of the Ecoregion and subecoregions;

E.    An order that EPA rescind its approval of the revised dissolved oxygen criteria and promulgate revised criteria which comply with the requirements of the Clean Water Act;

F.    An order that EPA rescind its approval of the revised boundaries of the ecoregion and subregions and remanding for further consideration consistent with the Clean Water Act and its implementing regulations;

G.    An award of reasonable attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

H.    Such other relief as this Court may deem appropriate.

Respectfully submitted this 16th day of February, 2018

TULANE ENVIRONMENTAL LAW CLINIC

/s/ Lisa Jordan_____
Lisa Jordan, La. Bar Number 20451
Supervising Attorney
6329 Freret St., Suite 130
New Orleans, LA 70118
Tel. No. (504) 314-2481
Fax No. (504) 862-8721

/s/ Kavan Vartak
Kavan Vartak
Student Attorney
6329 Freret St., Suite 130
New Orleans, LA 70118
Tel. No. (469) 774-5043
Fax. No. (504) 862-8721

*Counsel for Gulf Restoration Network, Little Tchefuncte River Association, Louisiana Environmental Action Network, Louisiana Audubon Council, and Sierra Club*

**SUPERVISING ATTORNEY'S INTRODUCTION OF STUDENT PRACTIONER**

Undersigned counsel respectfully introduces law student practitioner Kavan Vartak to this Court pursuant to Local Rule 83.2.13. This student practitioner is duly enrolled in Tulane Law School and the Tulane Environmental Law Clinic. He meets all of the prerequisites for a Law Student Appearance under Local Rule 83.2.13(A). His clients' written consents to student appearances are attached as Exhibit A in globo to this Complaint pursuant to Local Rule 83.2.13. The Tulane Law School Dean's certification that the student practitioner is of good moral character, competent legal ability, and adequately trained to perform as a legal intern is attached as Exhibit B to this Complaint pursuant to Local Rule 83.2.13(B).

Respectfully submitted,

/s/ Lisa W. Jordan
Lisa W. Jordan, Bar No. 20451
Supervising Attorney
Tulane Environmental Law Clinic
6329 Freret Street, Suite 130
New Orleans, LA 70118

20