**EXHIBIT A**

| ¶ | Complaint | Answer |
|---|-----------|--------|
| *1* | This case is about the EPA's approval of drastically lowered levels of dissolved oxygen in thirty-one rivers, streams, creeks, bays, and bayous north and west of Lakes Pontchartrain and Maurepas and extending south and west to the Mississippi River ("affected waterbodies" or "affected waters"). To approve these nearly hypoxic standards, EPA disregarded Clean Water Act requirements that water quality criteria must protect the fish and wildlife which live in these waterbodies, relied on unsound science, and lacked a rational basis for the approval. | The first sentence of Paragraph 1 generally characterizes Plaintiffs' claims and requires no response. **The second sentence of Paragraph 1 states legal conclusions to which no response is required**. |
| 2 | EPA also approved these hypoxic water quality standards without insuring that the drastically lowered criteria would not jeopardize the continued existence of species listed under the Endangered Species Act (ESA), like the Gulf sturgeon, or result in the adverse modification of their critical habitat. | **Paragraph 2 generally characterizes Plaintiffs' claims and states legal conclusions, for which no response is required.** |
| 4 | The drastically lower dissolved oxygen criteria approved by EPA allows significant amounts of additional pollution – including treated sewage – to be discharged into these rivers, streams, creeks, bays, and bayous. | **Paragraph 4 characterizes Louisiana's revised criteria which speak for themselves, and are the best evidence of their contents.** To the extent the allegations are inconsistent with Louisiana's revised criteria, EPA denies those allegations. |
| 5 | This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 (federal question jurisdiction). The case presents a federal question under the Clean Water Act § 303(c)(3), 33 U.S.C. § 1313(c)(3). | **Paragraph 5 states a legal conclusion to which no response is required.** |

| | | |
|---|---|---|
| 6 | Additionally, this Court has jurisdiction of the Endangered Species Act claims under the citizen suit provision of the Endangered Species Act, 16 U.S.C. § 1540(g), because "the district courts shall have jurisdiction, without regard to the amount in controversy or citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be." | **Paragraph 6 contains a legal conclusion to which no response is required. In addition, paragraph 6 quotes and characterizes the Endangered Species Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Endangered Species Act, Defendants deny it. |
| 7 | This Court may additionally grant relief under 28 U.S.C. § 2201 (Declaratory Judgment Act). | **Paragraph 7 states a legal conclusion to which no response is required** |
| 8 | Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiffs Gulf Restoration Network and the Little Tchefuncte River Association reside in the Eastern District and the action involves no real property. | **Paragraph 8 contains a legal conclusion to which no response is required.** Defendants lack information sufficient to admit or deny the factual allegations in Paragraph 8. |
| 9 | Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because "a substantial part of property that is the subject of the action is situated" in the Eastern District. | **Paragraph 9 contains a legal conclusion to which no response is required.** Defendants lack information sufficient to admit or deny the factual allegations in Paragraph 9. |
| 10 | Venue is additionally proper in this Court pursuant to the Endangered Species Act, 16 U.S.C § 1540(g)(3)(A), because "any suit under this subsection may be brought in the judicial district in which the violation occurs." | **Paragraph 10 contains a legal conclusion to which no response is required. In addition, paragraph 10 quotes and characterizes the Endangered Species Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Endangered Species Act, Defendants deny it. |
| 15 | Gulf Restoration Network is a "person" as defined by the Administrative Procedure Act (APA), 5 U.S.C. § 551(2). | **Paragraph 15 states a legal conclusion to which no response is required.** |
| 17 | Little Tchefuncte River Association is a "person" as defined by the APA. | **Paragraph 17 states a legal conclusion to which no response is required.** |
| 19 | Louisiana Environmental Action Network is a "person" as defined by the APA. | **Paragraph 19 states a legal conclusion to which no response is required.** |

| 21 | The Louisiana Audubon Council is a "person" as defined by the APA. | **Paragraph 21 states a legal conclusion to which no response is required.** |
|---|---|---|
| 23 | Sierra Club is a "person" as defined by the APA. | **Paragraph 23 states a legal conclusion to which no response is required.** |
| 24 | Defendant Environmental Protection Agency is an agency as defined by the Administrative Procedure Act. 5 U.S.C. § 701(b)(1). | **Paragraph 24 states a legal conclusion to which no response is required.** |
| 25 | EPA is responsible for review and approval of state water quality standards, pursuant to 33 U.S.C. § 1313(c)(2)(a), and is responsible for compliance with section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2). EPA approved the water quality standards challenged in this case ("revised dissolved oxygen criteria," "revised criteria" or "revised DO criteria"). | **The first sentence of Paragraph 25 states legal conclusions to which no response is required.** Defendants admit the allegation in the second sentence of Paragraph 25. |
| 27 | Defendant Anne Idsal is EPA's Region 6 Regional Administrator and an officer as defined by 5 U.S.C. § 2104. She is responsible for review and approval of Louisiana water quality standards pursuant to 40 C.F.R. § 131.21, including the water quality standards at issue in this case. She is sued in her official capacity. | Defendants admit the allegations in the first sentence of Paragraph 27. **The second sentence of Paragraph 27 characterizes an EPA regulation, which speaks for itself and is the best evidence of its contents.** To the extent the allegations in the second sentence of Paragraph 27 are inconsistent with that regulation, EPA denies those allegations. The third sentence of Paragraph 27 characterizes Plaintiffs' complaint, which speaks for itself. |
| 28 | The Administrative Procedure Act (APA) provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review." 5 U.S.C. § 704. | **Paragraph 28 quotes and characterizes the Administrative Procedure Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegations in Paragraph 28 are inconsistent with the Administrative Procedure Act, Defendants deny it. |

3

| | | |
|---|---|---|
| 29 | The APA authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), and (C-D). | **Paragraph 29 quotes and characterizes the Administrative Procedure Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Administrative Procedure Act, Defendants deny it. |
| 30 | The goal of the Clean Water Act (CWA or "the Act") is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). | **Paragraph 30 quotes and characterizes the Clean Water Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Clean Water Act, Defendants deny it. |
| 31 | The Clean Water Act also creates a national goal of attaining "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water," often referred to as a goal of fishable and swimmable waters. Clean Water Act § 101(a)(2), 33 U.S.C. § 1251(a)(2). | **Paragraph 31 quotes and characterizes the Clean Water Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with the Clean Water Act, Defendants deny them. |
| 32 | To achieve this goal, the Clean Water Act directs states to set water quality standards that establish, and then protect, the quality of water necessary to achieve the goals of the Act. 33 U.S.C. § 1313(a). | **Paragraph 32 characterizes the Clean Water Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Clean Water Act, Defendants deny it. |
| 33 | The Clean Water Act directs EPA to review states' water quality standards to determine whether they comply with the requirements of the Clean Water Act. Clean Water Act § 303(c)(2)(A) and (c)(3), 33 U.S.C. § 1313(c)(2)(A) and (c)(3). | **Paragraph 33 characterizes the Clean Water Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Clean Water Act, Defendants deny it. |
| 34 | The purposes of water quality standards include "defin[ing] the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses." 40 C.F.R. § 130.2. | **Paragraph 34 quotes and characterizes a federal regulation, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the federal regulation, Defendants deny it. |

| | | |
|---|---|---|
| *35* | Whenever states adopt new water quality standards or revise existing water quality standards, the standards "shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of [the Clean Water Act]. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and [other purposes]." Clean Water Act § 303(c)(2)(A), 33 U.S.C. § 1313(c)(2)(A). This language includes an antidegradation policy, requiring that state standards be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation. | **Paragraph 35 quotes and characterizes the Clean Water Act, which speaks for itself and is the best evidence of its contents.** To the extent those allegations are inconsistent with the Clean Water Act, Defendants deny them. |
| *36* | In addition to defining the water quality goals of a water body, water quality standards provide the regulatory basis for establishing water quality-based effluent limits for permits allowing pollutant discharges and also serve as a target for restoration procedures such as listings of impaired waters and setting of total maximum daily loads. | **Paragraph 36 characterizes the Clean Water Act and federal regulations, which speak for themselves and are the best evidence of their contents.** To the extent those allegations are inconsistent with the Clean Water Act or federal regulations, Defendants deny them. |
| *37* | Water quality standards consist of 1) designated uses, 2) water quality criteria necessary to protect the designated use, and 3) antidegradation requirements. | **Paragraph 37 characterizes federal regulations, which speak for themselves and are the best evidence of their contents.** To the extent the allegation is inconsistent with federal regulations, Defendants deny it. |

| | | |
|---|---|---|
| *38* | Fish and Wildlife Propagation is one category of designated use. This category is defined in Louisiana as "the use of water for aquatic habitat, food, resting, reproduction, cover, and/or travel corridors for any indigenous wildlife and aquatic life species associated with the aquatic environment. This use also includes the maintenance of water quality at a level that prevents damage to indigenous wildlife and aquatic life species associated with the aquatic environment and contamination of aquatic biota consumed by humans." La. Admin. Code tit. 33, pt. IX, § 1111. | **Paragraph 38 quotes and characterizes Louisiana's water quality standards, which speak for themselves and are the best evidence of their contents.** To the extent the allegations in Paragraph 38 are inconsistent with Louisiana's water quality standards, Defendants deny them. |
| *39* | Outstanding Natural Resource Waters is another category of designated use adopted by Louisiana. This category is defined as including "waterbodies designated for preservation, protection, reclamation, or enhancement of wilderness, aesthetic qualities, and ecological regimes, such as those designated under the Louisiana Natural and Scenic Rivers System or those designated by the department as waters of ecological significance." La. Admin. Code tit. 33, pt. IX, § 1111. | **Paragraph 39 quotes and characterizes Louisiana's water quality standards, which speak for themselves and are the best evidence of their contents.** To the extent the allegations in Paragraph 39 are inconsistent with Louisiana's water quality standards, Defendants deny them. |
| *40* | Water quality criteria are elements of state water quality standards, expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use. 40 C.F.R. § 131.3(b). | **Paragraph 40 characterizes federal regulations, which speak for themselves and are the best evidence of their contents.** To the extent the allegation is inconsistent with federal regulations, Defendants deny it. |
| *41* | "States must adopt those water quality criteria that protect the designated use. Such criteria must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use." 40 C.F.R. § 131.11(a)(1). | **Paragraph 41 quotes a federal regulation, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with federal regulations, Defendants deny it. |

6

| | | |
|---|---|---|
| *42* | The Clean Water Act allows states to revise water quality standards. 33 U.S.C. § 1313(c)(2)(a). | **Paragraph 42 characterizes the Clean Water Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Clean Water Act, Defendants deny it. |
| *43* | Where the water quality equals or exceeds the levels necessary to protect the designated use or otherwise required by applicable water quality standards, the water quality standard "may be revised only if such revision is subject to and consistent with the antidegradation policy established under this section." 33 U.S.C. § 1313(d)(4)(B). | **Paragraph 43 quotes and characterizes the Clean Water Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Clean Water Act, Defendants deny it. |
| *44* | States may establish water quality criteria based on site-specific conditions. 40 C.F.R. § 131.12(a)(2). | **Paragraph 44 characterizes a federal regulation, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the federal regulation, Defendants deny it. |
| *45* | Both new and revised water quality standards must be established taking into consideration the use of the water for, among other things, propagation of fish and wildlife and recreational purposes. | **Paragraph 45 characterizes the Clean Water Act and federal regulations, which speak for themselves and are the best evidence of their contents.** To the extent the allegation is inconsistent with the Clean Water Act or federal regulations, Defendants deny it. |
| *46* | Such new or revised water quality standards "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U.S.C. § 1313(c)(2)(A). | **Paragraph 46 characterizes the Clean Water Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Clean Water Act, Defendants deny it. |
| *47* | The antidegradation component of the Clean Water Act requires that state standards be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation. | **Paragraph 47 characterizes the Clean Water Act and EPA's regulations, which speak for themselves and are the best evidence of their contents.** To the extent the allegation is inconsistent with the Clean Water Act and EPA's regulations, Defendants deny it. |
| *48* | EPA's antidegradation rules establish three levels of antidegradation protection: Tier 1, Tier 2, and Tier 3. | **Paragraph 48 characterizes federal regulations, which speak for themselves and are the best evidence of their contents.** To the extent the allegation is |

| | | inconsistent with the Clean Water Act and federal regulations, Defendants deny it. |
|---|---|---|
| *49* | Tier 1 protection establishes the minimum water quality standard for all of a state's waters and requires that "[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." 40 C.F.R. § 131.12(a)(1). | **Paragraph 49 quotes and characterizes a federal regulation, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the federal regulation, Defendants deny it. |
| *50* | Tier 2 protection applies when "the quality of the waters exceeds levels necessary to support the protection and propagation of fish, shellfish, and wildlife and recreation in and on the water." 40 C.F.R. § 131.12(a)(2). For such waters, EPA requires that their "quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located." Id. However, "[i]n allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully." Id. | **Paragraph 50 quotes and characterizes a federal regulation, which speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with the federal regulation, Defendants deny them. |
| *51* | Tier 3 protection provides that "[w]here high quality waters constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance, that water quality shall be maintained and protected." 40 C.F.R. § 131.12(a)(3). Outstanding National resource waters are also known in Louisiana as Outstanding Natural Resource Waters (ONRWs). | **The first sentence of Paragraph 51 quotes and characterizes a federal regulation, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the federal regulation, Defendants deny it. **The second sentence of Paragraph 51 characterizes Louisiana's water quality standards, which speak for themselves and are the best evidence of their contents.** To the extent the allegation in the second sentence of Paragraph 51 is inconsistent with |

8

| | | |
|---|---|---|
| | | Louisiana's water quality standards, Defendants deny it. |
| *52* | EPA must review any revised water quality standard to determine that it meets the requirements of the Clean Water Act. 33 U.S.C. § 1313(c)(3); 40 C.F.R. §§ 131.5, 131.21(b). | **Paragraph 52 characterizes the Clean Water Act and federal regulations, which speak for themselves and are the best evidence of their contents.** To the extent the allegation is inconsistent with the Clean Water Act or federal regulations, Defendants deny it. |
| *53* | If the standard is not consistent with the requirements of the Clean Water Act, EPA must disapprove the new or revised water quality standard. Clean Water Act § 303(c)(3), 33 U.S.C. § 1313(c)(3). | **Paragraph 53 characterizes the Clean Water Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Clean Water Act, Defendants deny it. |
| *54* | Under Endangered Species Act § 7(a)(2), 16 U.S.C. § 1536(a)(2), federal agencies must, "in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species[.]" | **Paragraph 54 characterizes the Endangered Species Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Endangered Species Act, Defendants deny it. |
| *55* | "Secretary" means the Secretary of the Interior and/or the Secretary of Commerce. 16 U.S.C. § 1532(15). The Secretary of the Interior delegated this authority to the U.S. Fish and Wildlife Service and the Secretary of Commerce delegated this authority to the National Marine Fisheries Service. 50 C.F.R. § 402.01(b). | **Paragraph 55 characterizes the Endangered Species Act and federal regulations, which speak for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with the Endangered Species Act and federal regulations, Defendants deny them. |

| | | |
|---|---|---|
| 56 | Agencies must use "the best scientific and commercial data available" in carrying out this duty. 16 U.S.C. § 1536(a)(2). | **Paragraph 56 characterizes the Endangered Species Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Endangered Species Act, Defendants deny it. |
| 57 | An agency must complete interagency consultation under Endangered Species Act section 7 before it "make[s] any irreversible or irretrievable commitment of resources with respect to the agency action" that "foreclos[es] . . . any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). | **Paragraph 57 characterizes the Endangered Species Act, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the Endangered Species Act, Defendants deny it. |
| 58 | Before EPA's approval, the applicable dissolved oxygen water quality criteria for the affected waters was 5.0 mg/L of dissolved oxygen for freshwater rivers and streams and 4.0 mg/L of dissolved oxygen for estuarine rivers and streams. | **Paragraph 58 characterizes Louisiana's water quality standards, which speak for themselves and are the best evidence of their contents.** To the extent the allegation in Paragraph 58 is inconsistent with Louisiana's water quality standards, Defendants deny it. |
| 60 | On June 20, 2015, the Louisiana Department of Environmental Quality (LDEQ) published a proposed rule ("proposal") – designated WQ091 – to lower the dissolved oxygen criteria from 5.0 mg/L (or 4.0 mg/L for estuarine waters) to 2.3 mg/L for the months of March through November for thirty-one inland streams north and west of Lakes Pontchartrain and Maurepas extending south and west to the Mississippi River ("revised dissolved oxygen criteria," "revised DO criteria," or "revised criteria"). | Defendants admit the allegation in Paragraph 60 to the extent it alleges that the Louisiana Department of Environmental Quality (LDEQ) published proposed rule WQ091 (LDEQ's Proposal) on June 20, 2015. **The remainder of the allegation in Paragraph 60 characterizes the LDEQ's Proposal, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with the LDEQ's Proposal, Defendants deny it. |
| 61 | LDEQ's proposal applied the revised criteria to the following waterbody subsegments: 040201, 040303, 040305, 040306, 040401, 040402, 040403, 040404, 040503, 040506, 040508, 040601, 040604, 040605, 040606, 040702, 040705, 040809, 040907, 040915, 040916, 040917, 041101, 041201, 041202, 040807, 040808, 040903, 040912, 040913, and 040914. | **Paragraph 61 characterizes LDEQ's Proposal, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with LDEQ's Proposal, Defendants deny it. |

| | | |
|---|---|---|
| 62 | In WQ091, LDEQ also proposed to revise the boundaries for 42 waterbody subsegments, resulting in the delineation of 21 new subsegments ("boundary revisions"). | **Paragraph 62 characterizes LDEQ's Proposal, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with LDEQ's Proposal, Defendants deny it. |
| 63 | The rivers, streams, creeks, bays, and bayous affected by the revised dissolved oxygen criteria are navigable waters. | **Paragraph 63 states legal conclusions to which no response is required.** |
| 64 | The rivers, streams, creeks, bays and bayous to which LDEQ proposed to apply the revised water quality criteria include Outstanding Natural Resource Waters like portions of the Tchefuncte River, the Blind River, and Bayou LaCombe. | **Paragraph 64 characterizes LDEQ's Proposal, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with LDEQ's Proposal, Defendants deny it. |
| 65 | The revised dissolved oxygen criteria apply to at least thirty-one rivers, streams, creeks, bays and bayous across a 9-parish area: St. Tammany Parish, Tangipahoa Parish, St. John the Baptist Parish, St. Charles Parish, St. James Parish, Ascension Parish, Livingston Parish, Iberville Parish, and East Baton Rouge Parish. | **Paragraph 65 characterizes LDEQ's Proposal, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with LDEQ's Proposal, Defendants deny it. |
| 66 | The thirty-one affected streams all belong to an area designated by LDEQ as the eastern Lower Mississippi River Alluvial Plains Ecoregion ("the Ecoregion"). | **Paragraph 66 characterizes LDEQ's Proposal, which speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with LDEQ's Proposal, Defendants deny it. |
| 68 | On September 4, 2015, Plaintiffs timely submitted comments to LDEQ opposing the revised dissolved oxygen criteria and boundary revisions. The comments included a 12-page affidavit from water quality expert, Dr. JoAnn Burkholder, detailing the many ways in which LDEQ's proposal was not supported by sound scientific rationale. | Defendants admit the allegation in Paragraph 68 to the extent it alleges that Plaintiffs submitted comments to LDEQ on September 4, 2015. **Whether those comments were "timely" states a legal conclusion to which no response is required. The remainder of the allegations in Paragraph 68 characterize Plaintiffs' comment document (Plaintiffs' State Comments), which speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with Plaintiffs' State Comments, Defendants deny them. |

| | | |
|---|---|---|
| *70* | On November 3, 2015, LDEQ issued a Comment Summary Response. LDEQ responded to some of Plaintiffs' comments, but LDEQ did not respond to anything in Dr. Burkholder's affidavit. Indeed, LDEQ did not even acknowledge the affidavit. | Defendants admit the allegation in Paragraph 70 to the extent it alleges that LDEQ issued a Comment Summary Response on November 3, 2015. **The remainder of the allegations in Paragraph 70 characterize the Comment Summary Response, which speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with the Comment Summary Response, Defendants deny them. |
| *71* | LDEQ made no changes to its proposed rule in response to public comment. | **Paragraph 71 characterizes the LDEQ's Proposal and the final rule, and Plaintiffs' State Comments, which speak for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with those documents, Defendants deny them. |
| *73* | On March 8, 2016, Plaintiffs sent comments to EPA requesting disapproval of the revised dissolved oxygen criteria and the redrawn subsegments. The letter included a supplemental expert affidavit from Dr. JoAnn Burkholder. | Defendants admit the allegation in Paragraph 73 to the extent it alleges that Plaintiffs sent comments to EPA on March 8, 2016 (Plaintiffs' EPA Comments). **The remainder of the allegations in Paragraph 73 characterize Plaintiffs' EPA Comments, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with Plaintiffs' EPA Comments, Defendants deny them. |
| *74* | On June 3, 2016, EPA approved Louisiana's revised dissolved oxygen criteria for all proposed subsegments and approved the boundary revisions. This approval is final agency action. | Defendants admit the allegations in the first sentence of Paragraph 74. **The allegation in the second sentence of Paragraph 74 states a legal conclusion to which no response is required.** |
| *75* | EPA also approved revised boundaries for 42 subsegments within the Ecoregion, the Southern Plains Terrace and Flatwoods Ecoregion, the Terrace Uplands Ecoregion, and the Coastal Deltaic Marshes Ecoregion. | **Paragraph 75 characterizes EPA's approval document, identified in Paragraph 74, which speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |

| 76 | These boundary revisions resulted in the delineation of 21 new subsegments and in revisions to descriptions of additional subsegments. | **Paragraph 76 characterizes EPA's approval document, which speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
|---|---|---|
| 77 | Some of the 21 new subsegments created in the boundary revisions are subject to the revised criteria. | **Paragraph 77 characterizes EPA's approval document, which speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| 78 | Neither EPA nor LDEQ determined whether any of the streams to which the revised dissolved oxygen criteria apply have dissolved oxygen water quality equaling or exceeding the level necessary to protect the designated use or otherwise required by applicable water quality standards. | **Paragraph 78 characterizes EPA's approval document and the administrative record, which speaks for itself and is the best evidence of its contents.** |
| 79 | Many of the streams to which the revised criteria apply have dissolved oxygen levels which equal or exceed the level necessary to protect the designated use. | **Paragraph 79 states legal conclusions to which no response is required.** |
| 80 | EPA was aware that many of the streams to which the revised criteria apply have dissolved oxygen levels which equal or exceed the level necessary to protect the designated use. | **Paragraph 80 characterizes EPA's approval document and the administrative record, which speak for themselves and are the best evidence of its contents.** To the extent the allegations are inconsistent with these documents, Defendants deny them. |
| 81 | EPA performed no antidegradation analysis before approving the revised criteria. | **Paragraph 81 characterizes EPA's approval document and the administrative record, which speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with these documents, Defendants deny them. |
| 82 | Neither EPA nor LDEQ determined whether the revised criteria complied with antidegradation policy. | **Paragraph 82 characterizes LDEQ's Proposal, Comment Summary Response, and EPA's approval document which speak for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with those documents, Defendants deny them. |

| 83 | The revised criteria applicable to many of the affected rivers and streams – including the Tchefuncte River – do not comply with antidegradation policy. | **Paragraph 83 states legal conclusions to which no response is required.** |
|---|---|---|
| 84 | Ambient monitoring data collected by LDEQ (station 116) over the past several decades indicate that the portion of the Tchefuncte River represented by subsegment 040506 met the 5.0 mg/l dissolved oxygen criterion in 238 of 242 measurements, that is, 98.4% of the time. Plaintiffs sent this water quality data to EPA during its review of the revised dissolved oxygen criteria. | **The allegations in the first sentence of Paragraph 84 characterize data collected by LDEQ, which data speaks for itself and is the best evidence of its contents.** To the extent the allegations in the first sentence of Paragraph 84 are inconsistent with that data, Defendants deny them. Defendants admit the allegation in the second sentence of Paragraph 84. |
| 88 | In its approval, EPA discounted the ambient water quality monitoring data from the Tchefuncte River and instead relied on continuous monitoring data from different waterbodies. | **Paragraph 88 characterizes EPA's approval document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| 89 | EPA relied on what it refers to as an "ecoregion" or "reference water body" approach in approving the sweeping application of site-specific criteria to thirty-one rivers, streams, creeks, bays and bayous in an entire region of the state (the Ecoregion). | **Paragraph 89 characterizes EPA's approval document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny it. |

| | | |
|---|---|---|
| 91 | The premise of the EPA's ecoregion approach and methodology for approving the revised dissolved oxygen site-specific criteria, as it relates to water quality and aquatic life, is that in the absence of human influences the water quality and aquatic life are more likely to be similar within an ecoregion than without, and that conditions in "reference water bodies" in the Ecoregion represent the best attainable or least impacted conditions of most water bodies within the Ecoregion. Therefore, the fish and wildlife propagation use and corresponding ecological conditions in "least impacted reference waters" in the Ecoregion are the basis for defining the DO criteria in the Ecoregion. | **Paragraph 91 characterizes EPA's approval document, as well as a 2008 EPA-LDEQ document "Development of Dissolved Oxygen (DO) Criteria and Assessment Protocols to Support Fish and Wildlife Propagation in Louisiana Waters Based on Ecological Regions (Ecoregions) and Water Body Types" (Louisiana Ecoregion document), which documents speak for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with those documents, Defendants deny them. |
| 92 | In its approval, EPA relied on monitoring data from 13 reference sites, seven of which were outside of the Ecoregion and six of which were within the Ecoregion, to determine the appropriate dissolved oxygen criteria for all rivers, streams, creeks, bays and bayous within the Ecoregion. | **Paragraph 92 characterizes EPA's approval document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with that document, Defendants deny it. |
| 93 | Several of the reference sites upon which EPA relied were subjected to man-made influences and had significant point and nonpoint source discharges impacting them. | **Paragraph 93 characterizes EPA's approval document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with that document, Defendants deny it. |
| 94 | Information regarding the point and nonpoint source discharges affecting the reference sites was presented to EPA. | **Paragraph 94 characterizes the administrative record, which speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| 95 | EPA did not respond to the information regarding the flaws in the reference site selection. | **Paragraph 95 characterizes EPA's approval document and the administrative record, which documents speaks for themselves and are the best evidence of its contents.** To the extent the allegations are inconsistent |

| | | with that document, Defendants deny them. |
|---|---|---|
| 96 | EPA's methodology to determine the appropriate revised dissolved oxygen criteria for all inland streams in the Ecoregion was based on water quality monitoring data from these reference waterbodies. | **Paragraph 96 characterizes EPA's approval document and the administrative record, as well as the Louisiana Ecoregion document, which documents speak for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with those documents, Defendants deny them. |
| 97 | EPA considered the water quality conditions in the inland rivers, streams, creeks, bays and bayous of the Ecoregion to be irrelevant, aside from the condition of the six reference waterbodies in the Ecoregion. Therefore, EPA ignored the water quality conditions in the inland rivers, streams, and bayous of the Ecoregion, other than the six reference waterbodies in the Ecoregion. | **Paragraph 97 characterizes EPA's approval document and the administrative record, which documents speaks for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with those documents, Defendants deny them. |
| 98 | EPA approved the revised criteria without any study of the impact the revised criteria would have on the fish and other aquatic life in the inland rivers, streams, creeks, bays and bayous of the Ecoregion. | **Paragraph 98 characterizes EPA's approval document and the administrative record, which documents speaks for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with those documents, Defendants deny them. |
| 99 | Based on its methodology, EPA disregarded ambient monitoring data from the affected waterbodies and relied instead on monitoring data from the 13 reference waterbodies. | **Paragraph 99 characterizes EPA's approval document and the administrative record, which documents speaks for themselves and are the best evidence of its contents.** To the extent the allegations are inconsistent with those documents, Defendants deny them. |
| 100 | In approving the DO criteria, EPA disregarded 90% of the monitoring data collected from the reference streams. Instead, it relied exclusively on the worst 10% (lowest DO readings) of the monitoring data. | **Paragraph 100 characterizes EPA's approval document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |

16

| | | |
|---|---|---|
| 104 | During a 2013 review of LDEQ's proposal, EPA commented to LDEQ that application of its proposed revised dissolved oxygen criteria to estuarine subsegments would be inappropriate, as no estuarine waters served as reference waterbodies. | **Paragraph 104 characterizes EPA's comments to LDEQ, which speak for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with that comment document, Defendants deny them. |
| 105 | On November 7, 2013, LDEQ responded to EPA's concern by clarifying that its proposed revision would only apply to freshwater inland streams and would not apply to estuarine or tidally influenced waters. | **Paragraph 105 characterizes a document identified in Paragraph 105, which document speaks for itself and is the best evidence of its contents.** To the extent the allegation is inconsistent with that document, Defendants deny it. |
| 106 | The revised dissolved oxygen criteria which LDEQ promulgated and EPA approved apply to estuarine and tidally influenced waters within the Ecoregion. | **Paragraph 106 characterizes Louisiana's water quality standards, which speak for themselves and are the best evidence of their contents.** To the extent the allegation is inconsistent with those water quality standards, Defendants deny it. |
| 107 | The revised dissolved oxygen criteria applies to at least ten waterbody subsegments which are designated Outstanding Natural Resource Waters ("outstanding National resource waters" or "Scenic Streams."). These include the Blind River (subsegments 040401 and 040403), portions of the Tchefuncte River (subsegments 040807 and 040808), portions of Bayou Cane (subsegments 040903 and 040914), portions of Bayou Lacombe (subsegments 040912 and 040913), Bayou Labranche (subsegment 040201) and Bayou Trepagnier (subsegment 040202). | **Paragraph 107 characterizes Louisiana's water quality standards, which speak for themselves and are the best evidence of their contents.** To the extent the allegation is inconsistent with those water quality standards, Defendants deny it. |
| 108 | Neither EPA nor LDEQ performed any study or analysis of whether the revised dissolved oxygen criteria would be protective of the Outstanding Natural Resource Waters use. | **Paragraph 108 characterizes LDEQ's Proposal, Comment Summary Response and EPA's proposal document, which documents speak for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with those documents, Defendants deny them. |

| | | |
|---|---|---|
| *109* | All of the affected waterbody subsegments covered by the revised dissolved oxygen criteria are designated Fish and Wildlife Propagation. | **Paragraph 109 characterizes Louisiana's water quality standards, which speak for themselves and are the best evidence of their contents.** To the extent the allegation is inconsistent with those water quality standards, Defendants deny it. |
| *110* | Neither EPA nor LDEQ performed any study or analysis of the impact of the revised dissolved oxygen criteria on fish and other aquatic life in the affected rivers and streams. | **Paragraph 110 characterizes LDEQ's Proposal, Comment Summary Response and EPA's proposal document, which speak for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with those documents, Defendants deny them. |
| *111* | Neither EPA nor LDEQ examined the effect of the revised dissolved oxygen criterion on fish that live or reproduce in the waters of the Ecoregion, including sensitive stages like larval and juvenile. | **Paragraph 111 characterizes LDEQ's Proposal, Comment Summary Response and EPA's proposal document, which documents speak for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with those documents, Defendants deny them. |
| *112* | EPA's basis for approving the sweeping application of site-specific criteria to thirty-one streams in an entire region of the state (the Ecoregion) is that the waterbodies in the Ecoregion are alike in significant ways. | **Paragraph 112 characterizes EPA's approval document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| *113* | EPA's methodology for revising the dissolved oxygen criteria for the Ecoregion relied on a determination that the waterbodies in the Ecoregion were like the waterbodies in the adjoining western Lower Mississippi River Alluvial Plains Ecoregion (western LMRAP). | **Paragraph 113 characterizes EPA's approval document, as well as the Louisiana Ecoregion document, and the 2013 LDEQ Use Attainability Analysis of Inland Rivers and Streams document, which documents speak for themselves and are the best evidence of their contents.** To the extent the allegations are inconsistent with those documents, Defendants deny them. |
| *114* | Once EPA concluded that the waterbodies in the Ecoregion were like the waterbodies in the western LMRAP Ecoregion, it automatically applied the criteria it had approved for the western Ecoregion to the Ecoregion. | **Paragraph 114 characterizes EPA's approval document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |

| | | |
|---|---|---|
| *115* | EPA did not use the ecological conditions in the least impacted reference waters in the Ecoregion as the basis for approving the DO criteria in the Ecoregion. Instead, EPA used the ecological conditions in the least impacted reference waters in the adjoining Ecoregion – the western LMRAP – as the basis for defining the DO criteria in the Ecoregion. | **Paragraph 115 characterizes EPA's approval document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| *116* | In approving the revised criteria, EPA did not consider whether the revised criteria would provide for the attainment and maintenance of the water quality standards of waters downstream from the affected waterbodies. | **Paragraph 116 characterizes EPA's approval document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| *118* | EPA disregarded the evidence that portions of the Tchefuncte River are unlike the described characteristics of waterbodies in the Ecoregion. | **Paragraph 118 characterizes EPA's approval document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| *120* | EPA approved application of the revised dissolved oxygen criteria to stream segments outside of the Ecoregion. | **Paragraph 120 characterizes EPA's approval document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| *127* | EPA did not consult with either the U.S. Fish and Wildlife Service (FWS) or the National Marine Fisheries Service (NMFS) (collectively, "the Services") regarding the effects of the revised criteria on listed species before approving the revised criteria on June 3, 2016. | **Paragraph 127 states legal conclusions regarding the meaning of "consult" under ESA Section 7(a)(2), to which no response is required. To the extent a response is required, Defendants state that after approval of the revised criteria, EPA engaged in correspondence with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service regarding EPA's approval of the revised criteria, which correspondence speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that correspondence, Defendants deny them. **The remaining** |

| | | |
|---|---|---|
| | | **allegations are legal conclusions for which no response is required.** |
| *128* | Before it approved the revised criteria on June 3, 2016, EPA was aware of its obligation under the Endangered Species Act to consult with FWS and/or NMFS before approving the criteria. | **Paragraph 128 states a legal conclusion, i.e., that ESA Section 7(a)(2) consultation was required before EPA approved the revised criteria, to which no response is required.** To the extent a response is required, Defendants provide the same response as set forth in response to the allegations in Paragraph 127. **The allegations in Paragraph 128 also characterize EPA's June 3, 2016 approval letter, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| *129* | EPA did not consult with the FWS or NMFS after approving the revised criteria until it received the Plaintiffs' January 10, 2017, Notice of Intent to Sue letter, after which it initiated informal consultation with the Services. | **Paragraph 129 states legal conclusions regarding the meaning of "consult" under ESA Section 7(a)(2), to which no response is required.** To the extent a response is required, Defendants provide the same response as set forth in response to the allegations in Paragraph 127. **In addition, the allegations characterize EPA's correspondence with the U.S. Fish and Wildlife Service and National Marine Fisheries Service, which correspondence speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with this correspondence, Defendants deny them. |
| *130* | EPA's action approving the revised criteria may affect the Gulf sturgeon and the Alabama heelsplitter. | **Paragraph 130 states legal conclusions regarding the meaning of federal regulations implementing ESA Section 7, for which no response is required.** |

| 131 | EPA's action approving the revised criteria is likely to adversely affect the Gulf sturgeon and the Alabama heelsplitter and result in the adverse modification of Gulf sturgeon critical habitat. | **Paragraph 131 states legal conclusions regarding the meaning of federal regulations implementing ESA Section 7, for which no response is required.** |
|---|---|---|
| 132 | EPA completed a Biological Evaluation on October 5, 2017, and concluded that its approval of the revised criteria may affect, but is not likely to adversely affect, the Gulf sturgeon or the Alabama heelsplitter. EPA sent this Evaluation to the FWS. | Defendants admit that EPA completed a Biological Evaluation on October 5, 2017 and sent that document to the U.S. Fish and Wildlife Service. **The remaining allegations in Paragraph 132 characterize EPA's Biological Evaluation, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| 133 | EPA's evaluation of whether its approval would adversely affect the Gulf sturgeon's critical habitat only considered whether it would result in physical alterations to that critical habitat, such as dams. | **Paragraph 133 characterizes EPA's Biological Evaluation, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| 134 | EPA did not complete consultation with the Services. | **Paragraph 134 states legal conclusions regarding the meaning of "consultation" under ESA Section 7(a)(2), to which no response is required.** To the extent a response is required, Defendants provide the same response as set forth in response to the allegations in Paragraph 127. |
| 135 | Due to EPA's failure to consult with the Services prior to approving the criteria, the FWS indicated it had no authority to consult and cannot remedy deficiencies in the agency's action after-the-fact, as the Endangered Species Act requires consultation on proposed agency actions. | The allegations in the first and last clauses of Paragraph 135 state legal conclusions regarding the meaning of "consult" and "consultation" under ESA Section 7(a)(2), to which no response is required.** To the extent a response is required, Defendants provide the same response as set forth in response to the allegations in Paragraph 127. **The remaining allegations in Paragraph 135 characterize a U.S. Fish and Wildlife Service document, which document speaks for itself and is the best evidence of its contents.** To the extent the |

| | | |
|---|---|---|
| | | allegations are inconsistent with that document, Defendants deny them. |
| *136* | FWS nevertheless noted deficiencies in EPA's Biological Evaluation, and told EPA that its action may allow subsequent state actions that may cause adverse effects to the Gulf sturgeon and the Alabama heelsplitter. | **Paragraph 136 characterizes a U.S. Fish and Wildlife Service document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants deny them. |
| *137* | Upon information and belief, EPA has not remedied the impacts of its approval on listed species or of its failure to complete consultation, nor has it remedied the deficiencies in its Biological Evaluation. | **Paragraph 137 states legal conclusions that EPA's approval of the revised criteria "may affect" listed species within the meaning of the federal regulations implementing ESA Section 7, and legal conclusions regarding the meaning of "consultation" under ESA Section 7(a)(2), for which no response is required.** To the extent a response is required for those allegations, Defendants provide the same response as set forth in response to the allegations in Paragraph 127. As to the allegation that EPA has not remedied "deficiencies" in the Biological Evaluation, the allegation is vague and ambiguous and denied on that basis. **Further, that allegation characterizes a U.S. Fish and Wildlife Service document, which document speaks for itself and is the best evidence of its contents.** To the extent the allegations are inconsistent with that document, Defendants further deny them on that basis. |
| *138* | EPA retains authority to take additional action regarding Louisiana's revised criteria. | **Paragraph 138 states a legal conclusion to which no response is required.** |

| | | |
|---|---|---|
| *139* | EPA's approval of the revised dissolved oxygen criteria violated the Clean Water Act and was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, and not in accordance with the law. | **Paragraph 139 states legal conclusions to which no response is required.** |
| *140* | EPA's approval of the Ecoregion boundary revisions violated the Clean Water Act and was arbitrary, capricious, an abuse of discretion, and not in accordance with the law. | **Paragraph 140 states legal conclusions to which no response is required.** |
| *141* | EPA's failure to comply with the consultation provision of the Endangered Species Act on its approval of the revised dissolved oxygen criteria is in violation of Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2). | **Paragraph 141 states legal conclusions to which no response is required.** |
| *142* | EPA's failure to comply with the consultation provision is a continuing violation of the Endangered Species Act. | **Paragraph 142 states legal conclusions to which no response is required.** |
| *143* | EPA's approval of the revised criteria is likely to harm the threatened Gulf sturgeon and threatened Alabama heelsplitter through negative impacts to water quality, including the water quality of the Gulf sturgeon's critical habitat. These harms, when taken together with baseline conditions and impacts of other ongoing and foreseeable activities, may jeopardize the continued existence of the Gulf sturgeon and Alabama heelsplitter, and may adversely modify the critical habitat of the Gulf sturgeon. | **Paragraph 143 states legal conclusions to which no response is required.** |
| *144* | EPA did not properly consider the impacts of its approval in its "not likely to adversely affect" determination. | **Paragraph 144 states legal conclusions to which no response is required.** |

| | | |
|---|---|---|
| *145* | EPA is therefore violating, and will continue to violate, Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), by failing to ensure that its approval will not jeopardize the continued existence of the Gulf sturgeon and Alabama heelsplitter and will not adversely modify the Gulf sturgeon's critical habitat. | **Paragraph 145 states legal conclusions to which no response is required.** |
| *146* | EPA's action approving the revised dissolved oxygen criteria is likely to jeopardize the continued existence of the Gulf sturgeon and the Alabama heelsplitter and results in the adverse modification of Gulf sturgeon critical habitat, in violation of Section 7(a)(2) of the Endangered Species Act. | **Paragraph 146 states legal conclusions to which no response is required.** |
| *147* | EPA's Biological Evaluation of the effects of its approval on the Gulf sturgeon and Alabama heelsplitter is arbitrary and capricious and not based on the best scientific and commercial data available because, among other deficiencies, it failed to evaluate how listed species individuals and relevant physical and biological features of designated critical habitat are reasonably certain to respond to exposure to water quality conditions as specified under the revised criteria and failed to consider its approval's adverse effects on aspects of critical habitat other than physical modifications. | **Paragraph 147 states legal conclusions to which no response is required.** |